IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Orrin T. Skretvedt,

|  |  |  |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C. A. No. 98-61(MPT) |
| | ) | |
| E. I. Du Pont de Nemours & Co., Inc., et.al., ) | | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF ORRIN SKRETVEDT'S**

**REPLY BRIEF**

**ON REMAND FROM THE THIRD CIRCUIT**

**TO ESTABLISH COMPENSATION FOR**

**DELAYED PAYMENT OF EMPLOYEE BENEFITS**

By: /s/ John M. Stull
John M. Stull (#568)
1300 N. Market Street, Ste 700
P. O. Box 1947
Wilmington, DE 19899
(302) 654-0399
jstullesq@aol.com
November 28, 2005                          Attorney for Plaintiff

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Orrin T. Skretvedt ("Skretvedt") sought benefits under the Incapability provision of Defendant DuPont's Pension and Retirement Plan ("P & R Plan") and under the Total and Permanent Disability Income Plan ("T&P Plan") through court action filed in the District of Delaware (No. 98-61(MPT)). As a result of his appeal to the Third Circuit from a denial in District Court of his benefit claims, Skretvedt was directly awarded Incapability pension benefits by the Third Circuit panel, and, after the action was remanded, was "voluntarily" awarded his benefits under the T&P Plan by DuPont as fiduciary.

Following these awards, Plaintiff applied to District Court for his claims for "interest" on delayed payments of benefits under each of these two plans. Denial by the District Court of any "interest" award was on the basis of the case of Great-West v. Knudson and its denial of actions under ERISA as seeking a monetary award. Skretvedt then appealed this denial of "interest" to the Third Circuit on the basis that the withholding payment of benefits by fiduciary (DuPont) of benefits due was a fiduciary breach under the trust law concepts of ERISA. By opinion filed June 16, 2004, the Third Circuit reversed and remanded the matter to the District Court for purposes of making a record as to "interest" or "gain" realized by DuPont by delay of benefits as "appropriate equitable relief" under ERISA.

Exhibits and documents were obtained by discovery by which to provide data and a record as to the "value" to DuPont as fiduciary for its use of funds retained that should have been disgorged to Skretvedt. This Reply Brief is Skretvedt's presentation of his response to Dupont's Answer Brief and continues his assertion that DuPont has profited from retaining funds due to him and further provides a record as a basis for seeking additional compensation on his withheld benefits under both plans. The Third Circuit decision is found at 372 F.3d 193 (3rd Cir.2004). This Reply Brief is filed as of November 28, 2005.

## SUMMARY OF ARGUMENT

### I. PENSION AND RETIREMENT PLAN (INCAPABILITY) BENEFITS

Payment of "Incape" benefits under the Incapability provision of the P & R Plan is an early pension benefit without an actuarial reduction for payment prior to age 65, or comparable age and service related computations adding to "85." Skretvedt's payments under this plan were retained by the P & R Plan as part of its pension trust fund, and added to the total assets available under the fund by use for earnings and asset appreciation and under the control of the Trust Fund.

Documents filed by DuPont with the PBGC and other U. S. governmental agencies (Internal Revenue Service) that are public document disclosures show an asset appreciation for the Pension Trust fund from year to year that reflect earnings and appreciation of the fund. (See Opening Brief; Pl. App. at 1-12) These "earnings" and other asset appreciation increments will show that from 1995 (when Skretvedt was discharged) to 2002, when benefits began to be paid, the average yearly increments amounted to 12.65% using zero for two years of no returns or negative returns. Because of the recognition by the Third Circuit in its last review that a fiduciary is charged with a standard interest rate on funds that have not been invested, or were poorly managed, Skretvedt has adjusted the "zero" and "negative return" years for pension plan assets to 14.01%, as a response to DuPont raising the issue in its Answer Brief.

Skretvedt therefore can document and show via calculation on an annuity basis that the value to DuPont and its Pension Trust Fund for retaining his benefits for seven years is determined to be $88,818. Interest on this total compensation due for use of funds following the date that the compensation for use of funds (February, 2002) is $37,038 for a total disgorgement of $135,856.

## II.  TOTAL AND PERMANENT DISABILITY INCOME PLAN BENEFITS

Payment of "T & P Plan" benefits are payments from the DuPont Company cash accounts otherwise used for commercial purposes to fund business unit activities.  As a result of DuPont as a fiduciary retaining funds that should have been paid to Skretvedt, the value to DuPont that is to be disgorged is an amount calculated at a rate by which the Company produces a "return on investment" (IRR, or Internal Rate of Return).  This IRR is used as a standard for committing investment funds for commercial purposes.  Discovery and deposition information by Skretvedt of a Dupont-chosen expert (Reginald Malmberg) show that the Company funds are not committed unless the rate of return (IRR) will be forecast to be an average of 25%.  While DuPont complains that Skretvedt has not shown that Dupont's "actual" gains from funds so retained for commercial purposes is "25%," Skretvedt points out that neither has DuPont so shown.  DuPont has had an opportunity to present such detail but has chosen no to do so.

This "average" of 25% is gleaned from deposition and Exhibits of Reginald Malmberg and using this rate of return indicates that Skretvedt's benefits funds were of value to the Company for commercial return rates of 25%.  Applying this to T & P Plan benefits not paid for seven years results in a value to the Company of $226,221.  Interest at 10% on this total "interest" amount for three and one-half years, from February, 2002 to September, 2005 totals $94,337 thus comprising a total due as compensation for delayed T & P benefits of $320,558.

These rates of return and interest on interest, all of which are calculated and verifiable, total $456,414 as compensation to Skretvedt for the value to DuPont of retained funds by DuPont as fiduciary (which funds should have been paid to Skretvedt as benefits) for its use in the pension plan and as funds available for uses in capital ventures and pension plan asset appreciation.

˘4˘

## STATEMENT OF FACTS

Skretvedt's employment was terminated in February, 1995. Because Skretvedt's disability was apparent at that time, he filed a claim and applied for benefits within weeks of his job termination. In truth, the record will show that Dr. Layton, Spruance Plant medical director, sought to file the application for disability for Skretvedt in January, 1995. (Exhibit A). This fact and state of Skretvedt's disability was recognized and noted in the Third Circuit Opinion at 372 F.3d, at 209, where the Court states "Skretvedt first applied for benefits in 1995." Following his job termination, no benefits under either Pension Plan Incapability or T & P Plan disability were paid until his appeal to the Third Circuit resulted in a reversal and remand to this Court in 2001. District Court then entered an order (12/13/01) for payment of pension (Incape) benefits from the Pension and Retirement Plan.

DuPont's conclusion as to T & P, while not the result of a direct court order, did mean T & P Plan standards for disability had been met, and made payments of T & P benefits on 3/16/02. This payment was referred to by the Third Circuit as "voluntary," i.e., not the result of a court order. However, the Third Circuit decision specifically noted that a participant whose ERISA benefits were delayed but ultimately paid voluntarily, could seek recovery of "pre-judgment" interest on these delayed [T & P] benefits as appropriate equitable relief. In addition, the Third Circuit describes its view of this process in its Opinion of 372 F.3d, at 209, n. 22., wherein the Court states "[I]ndeed, this case presents an even more compelling example than *Fotta I*, as Skretvedt did have to resort to litigation and was only paid T & P benefits voluntarily by DuPont in the late stages of this litigation."

DuPont seeks to stress that its ERISA claims process was proper and valid. Skretvedt points out (Exhibit B) that DuPont **refused to process** Skretvedt's appeal of his benefits denial until he initiated litigation. See 6/23/98 letter from Herbert Watson, Delegate of the Board, that, because of suit, his appeal is to be considered.

DuPont's further claim put forth in its Answering Brief is that Skretvedt's claim for disgorgement of profits should not be initiated until February, 1998, when his law suit was filed. DuPont's view is that Skretvedt did not "make a claim" until he filed suit. However, the Board's medical file will show that the issue of benefits was initiated **prior** to his job termination, as shown by documents in Skretvedt's disability file (Exhibit A). There is nothing in ERISA requiring a claimant to initiate a claim via legal action. Rather the opposite is true. A benefits lawsuit cannot begin, nor does a federal question cause of action arise under ERISA until completion of exhaustion of internal administrative remedies, i.e., a claim lodged before DuPont's Board of Benefits and Pensions. Skretvedt therefore disputes DuPont's statements that "interest" cannot begin to run until February, 1998 and avers that Skretvedt was denied his benefits as of February 5, 1995, his job termination date and his benefits initiation date.

Skretvedt also disputes DuPont's claim that interest cannot begin to run until he "filed his claim," in May, 1996. This is untrue since Skretvedt's exhaustion of remedies was not complete until the filing of his lawsuit caused DuPont to accept his appeal for consideration by and submission to the Board of Benefits and Pensions. As noted, DuPont did not accept his appeal until June 23, 1998, after he was forced to file suit to even have his appeal accepted, and his exhaustion of remedies concluded.

DuPont also presents an argument that Skretvedt "delayed" in pursuing his benefits claim until February, 1998, when he filed suit. Because of the above documented recalcitrance on the part of DuPont and its Board Delegates, Skretvedt disputes these assertions as factually unsupported and untrue.

As part of the "delay" of the process, Skretvedt asserts that DuPont itself intentionally delayed the legal process and its resolution in this entire matter by seeking to have Skretvedt's counsel disqualified from representing Skretvedt against DuPont. See DuPont's June 23, 1998, letter (Gretchen Bender to Stull) (Exhibit C) threatening Stull with a "conflict of interest" sanction via Motion to

Disqualify if he did not withdraw as counsel for Skretvedt. As shown by the record and Docket entries, Stull was indeed subject to a Motion to Disqualify filed on 10/7/98 (D.I. 41), but the Court, on September 27, 1999, (Robinson, J.), denied the Motion (D.I. 64). These confrontational tactics by DuPont (since Gretchen Bender states her "clients have authorized me to proceed with formal motions") delayed further these proceedings one year, from 1998 to 1999, with the Court and parties forced by depositions, briefings, and appendix submissions, to resolve the matter. Such litigation tactics also burdened the Court with unnecessary briefing, record review and the need to issue an Order denying the Motion.

As a summary of the calculations done and to refine amounts sought by Skretvedt in his Opening Brief, a new compensation Table and calculation "exhibits" supporting the summary amounts shown in the Table is included in this Reply Brief. Pension Fund Summary Annual Reports (SARs) are shown in Skretvedt's Opening Brief Appendix material (Exhibits at Pl. App. 13-26). Since two years of earnings of Pension Trust assets shown in these SARs were nearly "zero" or negative, Skretvedt points to Third Circuit statements that where a fiduciary retains assets and fails to seek to properly invest same, resulting in a loss, or no gain, a beneficiary is entitled to use a standard rate of "interest" to compensate for failure to invest. See 372 F.3d, at 215-216, n. 30.

Public documents provided by the DuPont Pension Trust will show yearly increments for the seven years of non-payment of pension (Incapability) benefits that are averaged at 12.65%. Because the Third Circuit ruled (per note 30, above) that a plaintiff should at least be able to apply an interest factor where the defendant has not invested his funds, Skretvedt applies a "5%" implied gain that DuPont's Pension Trust should have obtained while funds were under its control. Recalculating these SAR increases for seven years and substituting 5% for two "zero" years of gain, Skretvedt claims that the above 12.65% should now be 14.01% and make a claim to a factual basis by adding these yearly increments to his prior yearly references in his Opening Brief under the Statement of Facts.

Post-judgment interest rates are to be applied to "compensation" amounts under a constructive trust approach to reflect the **value to DuPont** for funds **retained** beyond their "due date" of when Skretvedt was actually paid his benefits. Where these "compensation" amounts are computed and calculated as due amounts, a post-judgment interest rate is due on these amounts as compensation for DuPont retaining the compensation amounts beyond the date they were due to be paid, namely, at the end of the period beyond the due date of the original benefits due dates. As noted in Skretvedt's Opening Brief, application of a 10% rate reflects post judgment interest under 6 <u>Del.C.</u> Section 2301(a) comprised of a federal funds rate of 5% and a 5% add-on by Section 2301(a). This process is also verified by its use in <u>Gelof v. Papineau</u>, 829 F.2d 452, 456 (3d. Cir.1987). Application of the "10%" rate to the above compensatory values for retained use of funds by DuPont for three and one-half years of post-judgment delay of payment of these compensation amounts calculates to the additional amounts $37,038 and $94,337.

The following time-line is shown to indicate Skretvedt did not cause delay:

### *Timeline of Skretvedt – DuPont Activity from 2/1995 to 2/1998*

| | |
|---|---|
| 2/5/1995 | OTS leaves DuPont, Incape & T&P disability benefits applied for. **No response** on application within the required 60 days. |
| 10/10/1995 | Skretvedt contacts counsel to force DuPont to respond to application, DuPont agrees to allow Skretvedt to reapply for both Incape and T&P benefits. **DuPont again fails to meet 60 day deadline.** |
| 5/1/96 | Skretvedt contacts John Stull to force DuPont to respond. |
| 5/23/96 | Incape benefit denial was received 5/23/1996, **4 months after response deadline**. |
| 6/28/96 | Skretvedt exercises right to appeal denial decisions. Letter requests additional clarification on precise information needed and clarification of terms requested by Skretvedt's doctors. **No Response.** |

| | |
|---|---|
| 7/10/96 | Because no response received to 5/23/96 letter, second letter sent to Herbert Watson requesting same information. **No Response.** |
| 1/15/ 97 | Letter sent to DuPont Medical by Skretvedt's family doctor requesting information **he** was seeking. **No Response.** |
| 3/26/97 | Skretvedt's physician sends second letter to DuPont Medical. **No Response.** |
| 5/15/97 | Absent any communication from DuPont to either Skretvedt or his doctor's requests for clarification, Skretvedt submitted appeal without the benefit of those answers. |
| 8/15/97 | DuPont fails **to meet 90 day response deadline** regarding denial of appeal. |
| 9/19/97 | Final letter sent to Claude Edmonds regarding DuPont's failure to respond to Appeal. **No Response.** |
| 2/4/98 | Skretvedt fills lawsuit **to force response.** Legal proceedings begin |
| 10/7/98 | **DuPont files Motion to Disqualify Skretvedt's Attorney** |
| 9/27/99 | Court rules on DuPont Motion and denies Motion |

## ARGUMENT

1.  Compensation for Incape funds retained by Pension Trust Fund.

A review of disclosed document submissions to the IRS as required for pension plans shows that DuPont's Pension Fund had a year to year average increase of 12.65%. This is an average of 24.85% increase for 1995, a 14.92% increase for 1996, a 19.38% increase for 19997, a 13.46 % increase for 1998, a15.49% increase for 1999, a [not used] .5% [actual 5%] increase for 2000, and an [actual 5%] [not used negative return, or "zero"] return for 2001. Note that where a fiduciary obtains no "return" or increase in its value of assets, the Court allows the control of the asset to be reflected in the value obtained from the retention of funds to allow an interest rate to be applied. Thus, instead of a zero amount, or a negative factor, an interest rate of 5% is used for an average to include all seven years, from 1995 when Skretvedt was fired, to 2002, when he was paid his back benefits of Incape from the Pension plan. This results in a restatement of data submitted in Skretvedt's Opening Brief to show new figures for plan years of 2000 and 2001 of 5%, and when factored in, results in a 14.01% average return to the Pension Trust for seven years.

Actual calculations of these percentages can be discussed at conference or on oral argument if needed, but the end of year figure for the Pension Fund is shown in each document, plus "earnings" to include asset appreciation and other items such as dividends by which to indicate solely incremental values, separate from the use of funds via payments of pension benefits.

2.  Compensation for values retained by DuPont for use in its commercial ventures.

A constructive trust is the basis for a "disgorgement" of profits since the funding for the Total and Permanent Disability Income Plan comes from DuPont cash accounts which are otherwise a source of day-to-day commercial activities.

The source of "rate of return" percentage is two-fold. One source is a confidential project review program that imposes financial standards for internal

analysis by company-wide managers, both business use and financial, at the Vice Presidential level. The other source for these seemingly high, 20%-30% numbers is also found in the deposition of Reginald Malmberg who is credited with creating the "program" noted as an Exhibit at Pl. App. 13 and continuing to 27. These pages show an extensive collection of evaluation guidelines to import concerns for various sets of projects, all of which are evaluated in order to increase profits, and consequently, stock holder value. Items such as years of pay-back, tax incentives, basic profitability, moving experimental projects in to commercialization, production efficiencies, expansion of production facilities, which country to locate a project in other that US, leasing versus purchase of other companies and well as machinery, or production facilities in general.

Internal rate of return (IRR) is considered favorable if it reaches 30%. A usual starting point can be 20% to 25%. Further items are referred to as PI, or profitability index. See Pl. App. 18 noting a 2.5 P.I and relating this to a 30% IRR, or Internal Rate of Return.

While rates of return numbers are only estimates by which to evaluate a project going forward, with a 25% starting point for "Company cash" commitments, it appears fair to Skretvedt that using a 25% rate of return for the value to DuPont for retaining his T & P benefits in the company's cash accounts is appropriate.

Mr. Malmberg testified that the program was drawn from prior documents, standards and programs that had been in existence since the early 1980's. Therefore, this analysis of rates of return would include the time period from 1995-2002 as the "value of retained benefits" period applicable to Skretvedt's claims.

While DuPont complains that Skretvedt has not shown that Dupont's "actual" gains from funds so retained for commercial purposes is "25%," Skretvedt points out that neither has DuPont so shown. DuPont has had an opportunity to present such detail but has chosen no to do so.

3. "Post-judgment" interest is due on amounts that the Court, in its broad discretion can impose using the case standards found in the Gelof case.

Prior references to Gelof v. Papineau, 829 F.2d 452, 456 (3d Cir.1987) were made above in Statement of Facts portion. This case referred to a Delaware Statute that imposed an additional 5% on the applicable federal funds rate, now running about 5%, on average. A more complete analysis of this federal funds rate is shown in prior submissions of Skretvedt and are included in his April 1, 2002, Opening Brief in suport of various claims, including the items discussed herein. See Exhibit B, table covering 1991 to 2001, and the discussion of Gelof case.

Some reference in prior correspondence and oral remarks of counsel indicated DuPont's position that Skretvedt did not make a "claim" until 1998, when he filed suit. However, in the Third Circuit decision of June 14, at 372 F.3d at 209, the Court noted Skretvedt's application for benefits was in 1995. This should be the starting point of a "funds retention" review and compensation to Skretvedt for the financial advantage to the pension fund and DuPont for such values. Further, as noted, Skretvedt does seek an equitable remedy and therefore has sought to verify financial bases therefor. Because the Third Circuit granted an equitable remedy approach, there is no claim to imposing a personal liability remedy that might be characterized as a legal remedy not available under ERISA.

All Skretvedt is asking of DuPont is to surrender it "profits" and "disgorge" its financial advantages obtained by keeping control of and utilizing to its advantage, monetary increments flowing from non-payment to Skretvedt of his benefit entitlement such as are due from DuPont as fiduciary which has the duty to act in the sole interest of any plan beneficiary under ERISA precepts. Following the Third Circuit requirement that a constructive trust be imposed on funds retained by DuPont, Skretvedt has sought to provide the Court with valid bases.

Any post-judgment award to apply to failure to pay disgorged profits at the time such profits were earned, or gained, should reflect the interest rates applicable at the time the profits were earned or gained.

# CONCLUSION

Utilizing the constructive trust approach as applied to each Plan will disgorge profits and value accruing to DuPont and the Pension Trust to value monetary assets that have accrued through retention of Skretvedt's benefits. Because of the use of a constructive trust, as permitted by the Third Circuit, "interest" as a market rate for use of money borrowed is not the standard. A standard of "interest" equated with the cost of valuing the "use of money" does not meet the standard for disgorging monetary benefit that DuPont has gained by failing to properly pay Skretvedt his Incape and T & P benefits when due.

As this delay in payment has afforded DuPont the opportunity to invest funds and obtain gain in its financial assets, the use of a constructive trust is the only useful vehicle by which such gains are to be measured. As Plaintiff's presentation Skretvedt's Opening Brief of his limited view of DuPont gains and asset appreciation has not been countered by DuPont to show any other factual basis for valuing increments in either Incape Pension Plan assets, or Company cash accounts and their use in investment in the Company's commercial activities, this Court should adopt Skretvedt's analysis and accept the amounts as not only correct, but fair to DuPont. Disgorgement of such gains are not punitive to DuPont, but do provide compensation to Skretvedt for DuPont's retention and control of moneys which rightly should have been timely paid.

Respectfully submitted,


/s/ JOHN M. STULL
John M. Stull (Del. Bar #568)
1300 N. Market St., Ste 700
P. O. Box 1947
Wilmington, DE 19899
Ph. 302) 654-0399
jstullesq@aol.com
          Attorney for Plaintiff
          Orrin T. Skretvedt

Dated:   November 28, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Orrin T. Skretvedt, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 98-61(MPT) |
| | ) | |
| E. I. DuPont de Nemours & Co., Inc., et.al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, John M. Stull, do hereby certify that on this 28th day of November, 2005, I did by means of electronic filing to counsel below and Hand Delivery provide to counsel for the above Defendants at the offices noted below two (2) copies of the foregoing Plaintiff's Reply Brief on Compensation for Delayed Payments and Appendix material in support thereof.

Mary E. Copper, Esq.
Sarah E. DiLuzio, Esq.
Elizabeth King, Esq.
Potter, Anderson & Corroon LLP
1313 N. Market Street
P. O. Box 951
Wilmington, DE 19899

/s/ John M. Stull
John M. Stull, Esq.

Dated: November 28, 2005

Teresa A. Buczek, Ph.D.

*Licensed Clinical Psychologist*

Individual, Family and Couples Psychotherapy

1241 Mall Drive

Richmond, Virginia 23235

Phone
(804) 794-5928

January 16, 1995

FAX
(804) 379-6385

James E. Layton, M.D.
Medical Supervisor
Spruance Plant
P. O. Box 27001
Richmond, VA   23261

Re:  Orrin Skretvedt
     SS#:  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

Dear Dr. Layton:

This letter is an attempt to complete the questions in the Physician Report B on Mr. Skretvedt.  The pertinent diagnosis, as I see it, is Adjustment Disorder with Mixed Emotional Features (309.28).  He is experiencing impaired concentration, impaired decision making ability, a loss of confidence, sleep impairment, depressed mood, loss of interest or pleasure in usual activities, loss of appetite with a weight loss of 15 lbs., insomnia, low self-esteem, feelings of hopelessness and worthlessness, feelings of being on edge, difficulty concentrating, shakiness, restlessness, fatigue, social withdrawal, procrastination, and inefficiency.  This diagnosis and these symptoms appear to be related to increased job pressures and responsibilities.

In regard to the question of whether these impairments are temporary or expected to be permanent, I am still unclear.  I recommend that he be considered unfit for work activity for the next 90 days.  During that time in therapy, we can better determine if he will be able to work at some other job at Dupont.  I do not believe that he will be able to return to his former position, and that this is a very unlikely possibility for now or the future.  In terms of restricted activities as a result of the above impairments, Mr. Skretvedt is able to perform basic functions such as driving, grooming, and preparing meals, but is unable to take on any kind of stressful job activity at this point in time.  Again, I recommend that he be reevaluated in 90 days to see what if any job activity he may resume at Dupont.

I hope this information is useful to you.  Please feel free to call me if you have any questions.

Sincerely,

Teresa A. Buczek, Ph.D.
Licensed Clinical Psychologist

EXHIBIT A

IDS0020088



June 23, 1998

Orrin T. Skretvedt
3807 Timber Ridge Road
Midlothian, VA 23113-0000

RE: Skretvedt v. DuPont, et al.

Dear Mr. Skretvedt,

DuPont has considered the issues raised in your lawsuit filed against DuPont and other related entities regarding your application for an incapability retirement pension and for benefits pursuant to the Total and Permanent Disability Income Plan. Without waiving any of the rights or defenses of any of the defendants, the Board of Benefits and Pensions will consider your appeal.

Please submit all documentation that you believe supports your appeal directly to me by August 1, 1998. The Board will consider your appeal after that date.

Very truly yours,

Herbert W. Watson
Operations Manager
Pension and Long Term Disability

cc:   John M. Stull, Esquire
      Dave Huff

EXHIBIT B

E. I. du Pont de Nemours and Company

Printed on Recycled Paper
LG-4878 Rev. 2/94

IDS0020041



DuPont Legal, D-7147
1007 Market Street
Wilmington, DE 19898
Tel. 302-773-3421
Fax 302-773-3050

June 23, 1998

**VIA HAND DELIVERY**

John M. Stull, Esquire
1220 North Market Street, Suite 710
P.O. Box 1947
Wilmington, DE 19899-1947

RE: Skretvedt v. DuPont

Dear John:

As I have mentioned before in several telephone conversations, we believe that your representation of Orrin Skretvedt against the DuPont defendants presents a conflict of interest. All of the defendants were your former clients and you advised them about the benefit and pension plans and procedures that are at issue in this case. On behalf of DuPont defendants, we hereby formally ask you to withdraw from the above-entitled case. See e.g. Webb v. E.I. DuPont de Nemours & Company, 811 F. Supp. 158 (D. Del. 1992); Nichols v. E.I. DuPont de Nemours, C.A. 95-525-LON, Order, Feb. 27, 1996. Please call me by July 1, 1998 to discuss this matter. My clients have authorized me to proceed with formal motions.

Very truly yours,

Gretchen Ann Bender
Morris, James, Hitchens & Williams
c/o Above Address

GAB/djl

IDS0020042

EXHIBIT C

E. I. du Pont de Nemours and Company

Printed on Recycled Paper
LG-4878 Rev. 2/94