**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

ORRIN T. SKRETVEDT,            :

                :
          Plaintiff,       :
                :
     v.                :     C.A. No. 98-61(MPT)
                :
E.I. Du PONT de NEMOURS  :
AND COMPANY, et al.,      :
                :
         Defendants.    :

## MEMORANDUM OPINION

---

John M. Stull, Esquire, 1300 N. Market Street, Suite 700, P.O. Box 1947, Wilmington, Delaware 19899, counsel for plaintiff Orrin T. Skretvedt.

Mary E. Cooper, Esquire, Kathleen Furey McDonough, Esquire and Elizabeth King, Esquire, Potter, Anderson & Corroon, LLP, Hercules Plaza 6th Floor, 1313 N. Market Street, P.O. Box 951, Wilmington, Delaware 19899; Evelyn H. Brantley, Esquire, E.I. du Pont Nemours and Company, 1007 Market Street, Wilmington, Delaware 19898, counsel for defendant E.I. du Pont de Nemours and Company.

---

Wilmington, Delaware
Date: December 11, 2006



FILED

DEC 11 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**THYNGE, U.S. Magistrate Judge**

This matter was remanded by the United States Court of Appeals for the

Third Circuit, which reversed this court's finding that *Great-West Life & Annuity*

*Insurance Co. v. Knudson*[1] precluded Skretvedt's claims for prejudgment interest on an

award of incapability benefits ("INCAP") and interest on the delayed payment of total

and permanent disability Plan benefits ("T&P"). The Third Circuit held that *Great-West*

does not apply to Skretvedt's claim for prejudgement interest with respect to incapability

benefits awarded pursuant to a court judgment under Employee Retirement Income

Security Act ("ERISA") § 502(a)(1)(B).[2] The Third Circuit also held, with respect to his

claim for interest on the delayed payment of T&P benefits, that *Great-West* does not

preclude a claim under ERISA § 502(a)(3)(B)[3] for restitution by way of a constructive

trust on interest earned on withheld benefits.[4]

The court must determine whether Skretvedt: (1) may recover prejudgment

interest on the award of INCAP benefits under § 502(a)(1)(B); (2) is entitled to interest

for delayed payment of T&P benefits under § 502(a)(3)(B); (3) should receive

postjudgment interest under 28 U.S.C. § 1961 for INCAP benefits; and (4) the

applicable interest rate, if any, to be applied to each form of recovery. The court will

utilize the Third Circuit's analysis in *Skretvedt II* to determine whether any interest is

due, and if so, what interest rate should be applied.

---

[1] 534 U.S. 204 (2002) ("*Great-West*").

[2] 29 U.S.C. § 1132(a)(1)(B).

[3] 29 U.S.C. § 1132(a)(3)(B).

[4] *See Skretvedt v. E.I. du Pont de Nemours and Co.*, 372 F.3d 193, 205 (3d Cir. 2004) ("*Skretvedt II*").

Under *Skretvedt II*, a prevailing plaintiff may obtain prejudgment interest under

§ 502(a)(1)(B) for benefits awarded.[5] The issues before the court are whether

> Skretvedt is entitled in light of this opinion to prejudgment interest on the
> award of incapability benefits and/or interest on the delayed payment of T
> & P benefits, without prejudice to Skretvedt's ability to file a timely motion
> for postjudgement interest on any resulting award of prejudgment interest
> (with respect to incapability benefits) or interest (with respect to T & P
> benefits).[6]

In order to analyze the foregoing issues, it is necessary to review the

relevant facts.

## BACKGROUND[7]

Skretvedt was employed by E.I. du Pont de Nemours and Company[8] from

June 28, 1974 to February 7, 1995. In early 1994, when he began to receive treatment

from his family physician for work-related anxiety, Skretvedt was working as a Senior

Research Environmental Engineer. Skretvedt took a leave of absence from his job at

DuPont on November 11, 1994, and did not, thereafter, return to work. During this

time, DuPont investigated whether Skretvedt qualified for disability benefits. For

reasons that the parties dispute, DuPont terminated Skretvedt's employment on

February 7, 1995.

Skretvedt filed a claim with the Equal Employment Opportunity Commission

---

[5] *See Skretvedt II*, 372 F.3d at 205, 208.

[6] *Id.* at 218.

[7] A more detailed statement of the facts underlying the parties' dispute can be found in *Skretvedt v. E.I. du Pont de Nemours & Co.*, 268 F.3d 167, 170-73 (3d Cir. 2001) ("*Skretvedt I*").

[8] The court collectively refers to Defendants' ERISA Planss and Skretvedt's former employer as "DuPont."

("EEOC") alleging that DuPont violated the Americans with Disabilities Act for firing him based on discrimination because of his anxiety disorder. The EEOC found no violation based on the information that Skretvedt submitted, and issued Skretvedt a right-to-sue letter. On September 29, 1995, acting on advice of counsel, Skretvedt signed a "Settlement Agreement and Release of All Claims" with DuPont. This agreement "released all of [Skretvedt's] employment-related claims against DuPont except for his application for disability benefits, which DuPont agreed to review in a 'neutral' manner."[9] Skredvedt applied for disability benefits under the Plan on October 1, 1995.

Following the settlement agreement, DuPont's three-member Board of Benefits and Pensions ("Board") reviewed Skretvedt's application for disability benefits and determined on May 23, 1996 that he was ineligible because, according to the Board, Skretvedt failed to show that he was "permanently incapable of performing the duties of [his] job with the degree of efficiency required by the Company, at the time of [his] termination."[10] Skretvedt was advised that, in order to succeed on an appeal of the Board's determination, he would have to submit "additional objective evidence that will indicate a total impairment of function,"[11] such as "MRI, X-ray reports and complete medical evaluations."[12] Skretvedt contended, and DuPont denied, that he and one of his doctors sent three letters to the Board's designate for appeals, requesting clarification of the types of "objective medical evidence" needed to perfect his

---

[9] *Skretvedt I*, 268 F.3d at 171.

[10] *Id.* at 172.

[11] *Id.*

[12] *Id.*

3

application on appeal because the nature of his alleged disability is psychological. After receiving no response to those letters, Skretvedt submitted a formal appeal to the Board on May 16, 1997.

Thereafter, Skretvedt initiated the present action on February 4, 1998, in which he alleges that: (1) the Board's denial of benefits was arbitrary and capricious; and (2) a conflict of interest existed in the evaluation of his application for benefits.[13]  On August 31, 1998, pursuant to a stipulation between the parties, the court ordered a stay of the instant action to complete the appeal process and further ordered that only the final decision of the Board would be subject to judicial review.

In October 1998, Skretvedt submitted to the Board updated opinion letters from his treating physicians, Dr. Harold Binhammer and Dr. Graenum Schiff, as well as a psychological report and opinion letter from Dr. Richard B. Zonderman.  Each letter stated that Skretvedt was unable to return to his position at DuPont.  Skretvedt also enclosed the "Explanation of Determination" from the Social Security Administration which, in the denial of benefits, concluded that Skretvedt's "condition prevents [him] from doing the type of work that [he] has done in the past," but specifically noted that his disability "does not prevent [him] from doing less demanding work that does not require extensive public contact."[14]

After his termination from DuPont in mid-1995, Skretvedt started a furniture repair and refinishing business.  The business earned a modest profit that year and lost

---

[13] In its Answer, DuPont responded that Skretvedt failed to exhaust his administrative remedies prior to filing his lawsuit, and therefore, the court had no jurisdiction over the matter.

[14] *Skretvedt I*, 268 F.3d at 172-73 (alteration in original).

4

money in 1996. Therefore, in May 1996, Skretvedt began a two year training period with the Virginia Department of Labor for a position as a compliance inspector. He continued in this position without difficulty until the end of his training period. When his responsibilities increased, however, his anxiety returned. On August 17, 1998, Dr. Schiff recommended that Skretvedt take a two month medical leave of absence. Skretvedt subsequently resigned from the Virginia Department of Labor and never returned from his medical leave.

On October 13, 1998, the Board issued a final denial of Skretvedt's appeal for disability benefits. Thereafter, the stay in this case was lifted and the parties filed cross-motions for summary judgment. The court granted summary judgement in favor of DuPont on September 6, 2000. Skretvedt appealed and the Third Circuit held that, under the arbitrary and capricious standard, DuPont's denial of INCAP benefits was not supported by substantial evidence.[15]

The Third Circuit remanded the matter, directing the court to grant summary judgment in favor of Skretvedt on his claim for INCAP benefits.[16] Further, in *Skretvedt I*, the Third Circuit vacated summary judgment for DuPont on the Board's denial of T&P benefits.[17] Thereafter, this court issued an order on December 13, 2001 directing

---

[15] *See id.* at 184 ("Because the medical evidence that Skretvedt presented makes it clear that he meets the eligibility standards for incapability benefits, and the Board can point to no conflicting medical evidence, we find that the Board's decision was arbitrary and capricious because it was 'without reason' and it was 'unsupported by substantial evidence.'") (citing *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000) (quoting *Abnathva v. Hoffman-La Roche Inc.*, 2 F.3d 40, 45 (3d Cir. 1993))).

[16] *See Skretvedt I*, 268 F.3d at 184.

[17] *See id.* at 185. Although the Third Circuit also vacated the court's order granting summary judgment on the count challenging the denial of Skretvedt's application for T&P benefits, it assumed "that the District Court will direct that DuPont's Board consider this claim in the *first instance*, since even though [Skretvedt] is incapable of performing the duties of his previous position at DuPont, he may nevertheless

DuPont to pay Skretvedt INCAP benefits. DuPont paid those benefits on March 6, 2002. Furthermore, despite no court order directing DuPont to pay T&P benefits, DuPont also paid Skretvedt T&P benefits on the same date.[18]

On April 1, 2002, Skretvedt filed an opening brief in support of his claims for short-term disability benefits, interest on delayed payment of benefits and related tax reimbursement claims.[19] The court denied Skretvedt's motion on August 21, 2002. Skretvedt moved for reconsideration on September 4, 2002, which was denied on November 12, 2002. Skretvedt filed a notice of appeal on September 20, 2002. Skretvedt then filed an amended notice of appeal, seeking a review of the August 21, 2002 and November 12, 2002 decisions. The Third Circuit issued *Skretvedt II* on June 16, 2004 with the rulings and remand directions discussed above.

On October 3, 2005 Skretvedt filed his opening brief for interest on delayed payments of employee benefits seeking prejudgment interest beginning February 8, 1995 and postjudgement interest.[20]

## DISCUSSION

After careful review of the facts in this matter and the Third Circuit's opinions in *Skretvedt I* and *Skretvedt II*, the court finds that Skretvedt is entitled to

---

be ineligible for T&P benefits." *Id.* (emphasis added).

[18] Subsequently, DuPont adjusted Skretvedt's INCAP and T&P benefits, in his favor, on April 15, 2002 and again on April 16, 2002.

[19] No motion accompanied Skretvedt's brief as required by our local rules, and the brief failed to specify the action or remedy requested. It did, however, mention in the conclusion, the word "interest."

[20] Further briefing was ordered by the court and in September 2006 the supplemental briefing was completed.

collect prejudgment interest on his INCAP benefits with a start date of February 8, 1995 (the beginning date when funds were withheld), but not entitled to interest on the delayed payment of his T&P benefits. Further, the court finds that, at this time, no award of postjudgment interest is allowed under 28 U.S.C. § 1961.

## A. Prejudgment Interest of INCAP Benefits

### 1. Denial of INCAP Benefits was Arbitrary and Capricious

DuPont relies upon the discretionary nature of prejudgment interest awards in ERISA matters, contending that neither disgorgement nor prejudgment interest should be awarded because any delay in paying INCAP benefits was not wrongful and its defense of Skretvedt's claim was appropriate. DuPont contends that imposing interest, especially the amounts Skretvedt proposes, would be inequitable. In support of its argument, DuPont reasons that it followed the ERISA rules and regulations and simply defended itself in the action.

Prejudgment interest can be awarded as part of the benefits award for an ERISA plaintiff who is successful under § 502(a)(1)(B). This amounts to interest on a judgment obtained pursuant to a federal statute. Prejudgment interest is ordinarily granted unless exceptional or unusual circumstances exist making such an award inequitable.[21] The granting of prejudgment interest, its rate or amount and the time period involved, however, is within the court's discretion, tempered by fairness and equity.[22]

---

[21] See Anthius v. Colt Indus. Operating Corp., 971 F.2d 999, 1010 (3d Cir. 1992) ("Thus prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable.").

[22] See Skretvedt II, 372 F.3d at 205-06 ("[I]n the absence of an explicit statutory command otherwise, district courts have broad discretion in response to awarding prejudgment interest on a judgment obtained pursuant to a federal statute" and "prejudgement 'interest is to be given in

7

Prejudgment interest is awarded when the amount of underlying liability is reasonably ascertainable and the relief granted would otherwise fall short of making the claimant whole because the use of the money which was legally due has been denied to the claimant. A prejudgment interest award is intended to serve two purposes: (1) compensate prevailing parties; and (2) promote settlement and deter attempts by the defendant to benefit from stalling litigation.[23]

For the reasons explained below, the court finds that DuPont has not provided a sufficient basis for denying Skretvedt prejudgment interest on INCAP benefits because, its arguments ignore the purposes of a prejudgment interest award.

DuPont retained the INCAP benefits, preventing Skretvedt from using the money as he wished. Moreover, the underlying liability of DuPont for those retained benefits is calculable.[24] Therefore, awarding prejudgment interest would fairly compensate Skretvedt.

The Third Circuit, in its decision to award INCAP benefits to Skretvedt, found that DuPont's denial of benefits was arbitrary and capricious. The Third Circuit took a precedential step, directly awarding INCAP benefits, rather than referring the application to DuPont for reconsideration. DuPont's sole argument against an award of prejudgment interest is that "DuPont has been simply defending its position that

---

considerations of fairness [and] denied when its extraction would be inequitable.'" (quoting *Anthius*, 971 F.2d at 1009) (second alteration in original)).

[23] *See Anthius*, 971 F.2d at 1010 (noting that prejudgment interest award promotes settlement and eliminates unjust enrichment from inherent delays in litigation).

[24] *Id.*

8

Skretvedt was not entitled to benefits under the Plan."[25] That defense, determined to be "without reason," leads to the conclusion that DuPont breached its fiduciary duty by wrongfully retaining such benefits. The Third Circuit held that "[b]ecause the medical evidence that Skretvedt presented made it clear that he meets the eligibility standards for incapability benefits, and the Board can point to *no* conflicting medical evidence . . . the Board's decision was arbitrary and capricious because it was 'without reason' and it was 'unsupported by substantial evidence.'"[26]

DuPont's argument that the court should deny interest also contradicts its own internal policy. DuPont's INCAP Plan provides for paying interest to Plan participants whose benefits have been delayed through no fault of the participant.[27] Despite DuPont's request that the court not award prejudgment interest, DuPont acknowledges its responsibility to pay interest on unpaid benefits when the Plan participant is not at fault. DuPont has presented no evidence that Skretvedt was at fault for the delay in receiving INCAP benefits. The assertion that Skretvedt is at fault for DuPont's acting "without reason" in denying those benefits is misplaced.

The Third Circuit concluded that "the ERISA Plans that withheld Skretvedt's benefits for several years and profited with respect to the withholding of those benefits . . . belong in good conscience to him."[28] Thus, prejudgement interest on Skretvedt's INCAP benefits should be awarded because: (1) DuPont's own Plan pays

---

[25] D.I. 207 at 7 (DuPont Supplemental Answering Brief).

[26] *Skretvedt I*, 268 F.3d at 184 (emphasis added).

[27] *See* D.I. 207 at 9.

[28] *Skretvedt II*, 372 F.3d at 214.

9

interest when delays in benefit payments are not the fault of the participant; and (2) Skretvedt, as the prevailing party, should be compensated for the cost of money damages incurred to make him whole. Therefore, the court determines that Skretvedt is entitled to prejudgment interest on his INCAP benefits.

### 2. Prejudgment Interest Applies Starting on the Date Funds Began to be Wrongfully Withheld

Skretvedt argues that prejudgment interest on his INCAP benefits should begin to run from the day following his termination by DuPont, that is, February 8, 1995. DuPont counters that since Skretvedt did not file suit for denial of disability benefits until February 4, 1998, prejudgment interest should begin as of that date. Alternatively, DuPont argues that another reasonable starting date for prejudgment interest is May 23, 1996, the date when the Board denied his application for INCAP and T&P benefits. Finally, DuPont contends that the earliest date for calculating prejudgment interest is October 1, 1995, the date when he first applied for disability benefits. In support of its various prejudgment interest start dates, DuPont alleges that Skretvedt was solely responsible for any delay.[29] As a consequence, DuPont contends any delay period should be excluded from any prejudgment interest award,[30] since "one of the reasons for denying an equitable remedy is delay by the claimant,"[31] particularly where an

---

[29] That is, the three year delay from his termination date to the filing of the lawsuit, the 21 month delay from the denial of benefits to the initiation of this action and the 28 month delay between the filing date for benefits and this matter.

[30] *See Valle v. Joint Plumbing Indus. Bd.*, 623 F.2d 196, 206-07 (2d Cir. 1980) (noting court's broad discretion to fix starting date to calculate prejudgment interest).

[31] *Fotta v. Trustees of the United Mine Workers*, 319 F.3d 612, 618 (3d Cir. 2003) (*Fotta II*).

10

ERISA claimant is "less than diligent in pursuing his claim for benefits."[32]  DuPont

argues that Skretvedt's calculations improperly assume that interest runs from the date

of his termination.[33]  DuPont maintains that having to pay interest for that time period

would constitute "inequitable treatment."[34]  Because of Skretvedt's purported delay in

bringing suit, DuPont concludes that the proper time period for calculating interest

begins February 4, 1998, the date suit was filed, and ends December 13, 2001, the

date the court entered judgment on plaintiff's behalf

The Third Circuit found that INCAP benefits were awarded under § 502(a)(1)(B)

through a court judgment.  As a result, prejudgment interest on such an award is

interest on a judgment pursuant to a federal statute which falls within the purview of the

court's discretion.  Skretvedt first applied for both INCAP and T&P benefits in October

1995.  Skretvedt is not primarily responsible for the three year delay in filing this action

because ERISA requires Plan participants to first seek resolution through administrative

remedies before a lawsuit may be filed.  Skretvedt complied with the ERISA

requirements for administrative review.  DuPont took the position that Skretvedt

prematurely filed his lawsuit in February 1998, and as a result, this matter was

temporarily stayed to allow DuPont to complete the appeal review, which finally

occurred in October 1998.  Tellingly, is DuPont's series of letters beginning in January

[32] *Hardtke v. Exide Corp.*, 821 F. Supp. 1021, 1031 (E.D. Pa. 1993).

[33] DuPont's argument, in part, relies on Skretvedt's delay in prosecuting his INCAP claim at the administrative level.

[34] In further support of its position that fault lies solely with Skretvedt, DuPont argues that Skretvedt had retained counsel and could have filed suit at any time.  *See* D.I. 207 at 4.  This argument, however, ignores and is inconsistent with the lack of jurisdiction defense for failure to exhaust administrative remedies which DuPont affirmatively raised in this matter.

11

2002 dealing with the retroactive payment of INCAP and T&P benefits. In a series of four letters ending on April 16, 2002, DuPont finally determined that the correct start date for both types of benefits to be February 8, 1995.[35] Therefore, February 8, 1995 is the appropriate start date from which to calculate prejudgment interest.

### 3. Calculation of Prejudgment Interest Rates on Withheld INCAP Benefits

Skretvedt argues that DuPont's ratio of earnings (e.g., income) to beginning of the year investment should guide the court's prejudgment interest award because this figure represents DuPont's annual return on investment. Skretvedt contends that, under a constructive trust analysis, he is due full disgorgement of the monetary benefit to DuPont for the retention of INCAP benefits from the date of his termination, February 8, 1995, until the date of payment, March 6, 2002. Skretvedt asserts that DuPont benefitted from the retained funds, which generated additional growth to the Plan trust fund by increasing the total assets available for earnings appreciation. As a result, Skretvedt maintains that the prejudgment interest rate should correlate to the percentage of growth in the value of Plan assets on an annual basis from 1995 to early 2002.[36] Skretvedt's disgorgement argument is based on the gains DuPont allegedly received as a result of wrongfully withheld assets in the pension trust

---

[35] See D.I. 206 at A52-A59.

[36] In support of his argument, Skretvedt relies on the Third Circuit's exhaustive discussion in Skretvedt II directed to its analysis of recovery of "interest" on delayed T&P benefits, § 502(a)(3)(B) and the application of a constructive trust, which did not deal with "prejudgment interest" on INCAP benefits. See Skretvedt II, 372 F.3d at 208-15.

12

fund.[37]

In determining the disgorgement amount, Skretvedt uses the percentage of growth for each year from 1995 to 2002 which averages to a 12.95% annualized rate of return.[38]  Skretvedt argues that this rate should apply to the seven year period to disgorge DuPont of its improper profits and make him whole.  According to Skretvedt, by using that rate, the value of the earnings appreciation or disgorgement amount is $93,633.[39]  Skretvedt references a timeline to support his argument that both prejudgment and postjudgment interest should be awarded, which outlines the events and delays in this matter.  Skretvedt contends that he was not dilatory in prosecuting his claims and, therefore, is entitled to the interest awards (prejudgment interest on INCAP and interest on T&P) demanded.

DuPont responds that Skretvedt's entire analysis of disgorgement or application of a constructive trust for delayed INCAP benefits is unsupported and contrary to *Skretvedt II*.[40]  As noted by DuPont, *Skretvedt II* clearly found that prejudgment interest on INCAP benefits was through a judgment obtained pursuant to a federal statute.[41]  As a result, DuPont initially discusses the rate for postjudgment interest under 28 U.S.C.

---

[37] Plaintiff makes the same disgorgement argument regarding T&P benefits.  Unlike INCAP benefits, T&P benefits are held in DuPont's cash accounts to fund business unit activities, which, according to Skretvedt, remained in those commercial accounts to obtain certain returns on investment.

[38] See D.I. 206 at A4-A19, specifically at A5.

[39] See id. at A12.  Skredvedt's proposed interest rate of 12.95% is a slight modification of his position in his original briefs on the issue.

[40] DuPont's primary argument is that Skretvedt is not entitled to prejudgement interest for the reasons previously noted herein.

[41] See *Skretvedt II*, 372 F.3d at 205.

13

§ 1961. Under that statute, prejudgment interest would be calculated at a fixed rate of 2.17%, which is the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of judgment on December 13, 2001.[42] Pursuant to that analysis, compounded annually from February 4, 1998 to December 13, 2001, the amount of prejudgment interest would be $4,517.56. A start date of October 1, 1995 would increase the amount to $10,903.49.[43]

DuPont 's emphasis, however, is that if prejudgment interest is awarded, the Plan's formula for calculating interest should control rather than the rate proposed by Skretvedt. According to DuPont, and unrefuted by Skretvedt, the formula of the Pension Plan for calculating interest paid to Plan participants whose benefits are delayed absent their fault is a simple interest rate of 120% of the Federal Reserve mid-term rate as of January in the year in which the delay occurred.[44] That policy insures market interest while not exposing the participant to a loss, which could occur if the Plan applied its investment performance. Since an overriding principle under ERISA is the nondiscriminatory treatment of Plan participants, this factor, DuPont contends, supports applying the Plan's interest rate. Using the rates proposed by DuPont, the prejudgment interest on INCAP benefits beginning on February 4, 1998 to December 13, 2001 is $5,521.69. If prejudgment interest is calculated from October 1, 1995, then

---

[42] See 28 U.S.C. § 1961(a).

[43] See D.I. 207 at 5 & Ex.A-1, A-2.

[44] 120% of the Federal Reserve mid-term rate was 9.54% in 1995, 6.89% in 1996, 7.34% in 1997, 7.13% in 1998, 5.59% in 1999, 7.47% in 2000 and 6.75% in 2001. See D.I. 198 at 10, Ex. A; D.I. 199; D.I. 207, Ex. B which contain the Rev. Rul. Tables for the years 1995 through 2001.

14

amount is $9,220.85.[45]

DuPont contends that Skretvedt's entire approach is flawed, because it, not only, confuses the Third Circuit's analysis of his interest claim for T&P benefits with the calculation of prejudgment interest for INCAP benefits, it also applies faulty logic in determining DuPont's return of investment. As Dupont notes, Skretvedt's analysis assumes that the ratio of earnings to beginning of the year investment shows DuPont's return on investment for the year. According to DuPont, Skretvedt's method is inaccurate because the change in asset values is not a true measure of how *his* assets actually performed and a Plan participant is at risk to lose income if there is a net loss. As a result, under Skretvedt's analysis, only the benefits from the expertise of the Plan's's investment advisors and not the risks, would inure to him.

DuPont contends that an individual would not obtain the same investment performance rate as the Pension Plan over the relevant time period and to apply such a rate is a highly speculative assumption: it presumes that Skretvedt would have made like commitment of his benefits in high yield, high risk investments, but eliminates any risk.[46] As DuPont observes, Skretvedt's analysis rewards him for risks that he did not incur. Moreover, according to DuPont, any rate of return "in excess of the risk-free yield on Treasury Bills . . . would be the result of the Plan's investment expertise and labor, as well as additional risk that the Plan, [and] not what [Skretvedt] bore."[47] As result, DuPont argues that the proper rate is a fixed income rate which provides a market rate

[45] *See* D.I. 207, Ex. C-1, C-2.

[46] *See Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 132-33 (3d Cir. 2000).

[47] *Id.* at 132.

15

of return without exposure to market risk.

Skretvedt's entire argument regarding the application of disgorgement or a constructive trust to INCAP benefits completely blurs the Third Circuit's analysis of prejudgment and postjudgment interest and restitutionary recovery. As noted by that court in *Skretvedt II*, his request for prejudgment interest under § 502(a)(1)(B) on INCAP benefits is "no more than an ordinary request for prejudgment interest on a judgment obtained pursuant to a federal statute."[48] No where in that opinion does the court suggest that its constructive trust/restitution analysis applies to prejudgment interest on INCAP. Contrary to Skretvedt's arguments, the Third Circuit took great pains to distinguish between "prejudgment interest" and "interest," and the differences between § 502(a)(1)(B) and § 502(a)(3)(B) and the recoveries thereunder.[49] As noted by that court, a claim under § 502(a)(3)(B) "was one cast in 'restitution-the traditional remedy for unjust enrichment'" since the statute allows for other "appropriate equitable relief." Under that statute, equitable relief is construed by reference to relief available in equity. Because the constructive trust remedy is a form of equitable restitution, which allows the trust to "be placed over 'interest' actually earned by a plan that has wrongfully delayed paying benefits," the Third Circuit directed its attention to that form of relief solely in its discussion on Skredvedt's claim for "interest" on delayed T&P benefits .[50] Of note, in its directions on remand, the Third Circuit commented:

---

[48] *Skretvedt II,* 372 F. 3d at 205.

[49] *Id.* at 208, n.21; 208-210.

[50] *Id.* at 208-15.

16

Of course, to the extent that Skredvedt seeks prejudgment interest on his incapability benefits, which were awarded by court judgment pursuant to § 502(a)(1)(B), wrongful withholding or wrongful delay *is not per se relevant*, as prejudgment interest in that context *derives from* § 502(a)(1) (B) and the *District Court's exercise of discretion* in awarding interest.[51]

DuPont's Plan establishes a consistent and uniform method regarding interest payments to Plan participants whose benefits are delayed through no fault of the participant. The Plan pays interest on the delayed benefit payments using a simple interest rate equal to 120% of the federal mid-term rate as of January of the year in which the delay occurred and benefits should have been paid. Skretvedt assumes, without any support, that he would have had the same return on investment as the Plan, that is, he would have taken the same risks and would have made the same investments.[52] He also assumes that he would have never consumed or used, throughout the entire period, the monthly INCAP income for his support.[53] Further, without any explanation, analyses or bases (accounting, economic or otherwise), to calculate DuPont's alleged "return," Skredvedt compares two numbers, the *total income*

---

[51] *Id.* at 215, n.29 (emphasis added).

[52] Since the original briefing where it appeared that Skredvedt's numbers were plucked from thin air, in his supplemental appendix, he submits the two paragraph report of Gail Harris, a paraprofessional. Her report provides no bases or analyses, just the conclusion that the math (primarily for compounding interest) was done correctly. Otherwise, the report contains no support for Skredvedt's suppositions and conclusions. The court has no idea who Ms. Harris is, although it assumes from the letterhead that she is in the employ of Charles B. Tuck, Jr. P.C. (whomever he is). Further, the court does not know the profession of either Mr. Tuck or Ms. Harris. All the court understands from Skredvedt's appendix is that Ms. Harris is a paraprofessional, which is defined as "a trained worker who is not a member of a given profession but assists a professional." *The American Heritage Dictionary of the English Language*, Fourth Ed., 2000. Moreover, to calculate prejudgment interest, Ms. Harris uses a "start date [of] 2/08/95. End date 2/06/02," which includes time *after* entry of the December 13, 2001 judgment. *See* D.I. 206, A-12. The time period after that order relates to postjudgment, not prejudgment, interest.

[53] In other words, Skredvedt's argument assumes that he would have invested every penny of his INCAP monthly income and that it would have cost him nothing to obtain, on average, a 12.95% rate of return.

17

earned by the Plan (before any reduction for expenses) during the year in question and the *net value* of the Plan assets as of January 1 of that year and ignores the *net increase* after expenses and liabilities, which is an "apples and oranges" comparison. Even if the court were inclined to apply a constructive trust to INCAP benefits (which it clearly is not), under that analysis, it is the *benefit* or *gain received* on the withheld funds under a restitutionary theory.[54]

Moreover, Skretvedt's interest rate calculations for 2000 in the amount of .46% and for 2001 in the amount of 2.2% are a completely mystery. In those years, the Plan experienced a decrease (or loss) in its net assets.[55]  To the extent his supplemental briefing relates to his argument in his original briefs on that issue, Skretvedt offers no evidence of any mismanagement or improper investment strategies by DuPont in its handling of the Plan.[56]

Skretvedt's approach on prejudgment interest is pure speculation,[57] and his tortured calculations demonstrate an unwillingness to accept the risks associated with

---

[54] *See Skretvedt II*, 372 F.3d at 214.

[55] *See* D.I. 206, Ex. A-11; D.I. 207, Ex. E.  Again, Skredvedt compares the total income earned by the Plan with its value as of January 1.  The court has no idea how the 2.2% increase for 2001 was calculated, particularly since the Plan, not only, experienced a decrease in its net assets, but also, a total income loss of $373,079,219.  That amount was listed as a positive number in Skretvedt's Ex. A-5 in D.I. 206.

[56] Skretvedt appears to suggest that, under *Skretvedt II*, prejudgment interest at the standard rate may be awarded when accounts are mismanaged.  Without commenting on whether *Skredvedt II* stands for that proposition, no proof whatsoever has been provided by Skredvedt of any mismanagement by DuPont when a minimal increase or loss in the fund occurred.

[57] *See Holmes*, 213 F.3d at 132-33 (which found, when affirming the lower court's opinion, "[i]t would be 'highly speculative' to simply assume that [participants] would have invested their benefits in higher-risk, higher-yield securities, and that to so assume would be to reward them for risks they did not take") (citing *Holmes v. Pension Plan of Bethlehem Steel Corp.*, C.A. No. 98-CV-1241, 1999 U.S. Dist. LEXIS 4613, *7 (E.D. Pa. March 24, 1999)).

18

higher risk investments. He asks the court just to assume that he would have invested *all* INCAP income in similar investments as DuPont. Further, Skretvedt's argument is contrary to the non-discriminatory principles of ERISA because the compensation he seeks is substantially greater than amounts received by other participants for delayed payments.

DuPont's figures are more accurate. They afford a rate of return that is 20% above the Federal Reserve rate without exposure to a potential loss based upon the performance of a particular investment or the trust fund. By using 120% of the federal mid-term rate for the years in which payments were due, Skretvedt obtains a positive return without any risk. Further, such interest rates put Skretvedt on an equal footing with other Plan beneficiaries whose payments were also delayed. As a result, fairness and equity are both achieved.

Prejudgment interest, therefore, is calculated from February 8, 1995 through December 13, 2001 when judgment on INCAP benefits was entered. Applying DuPont's simple interest rate of 120% of the federal mid-term rate for the full years (1996 through 2000) and partial years (1995 and 2001) to the annual INCAP benefit of $21,300, results in prejudgment interest of $10,570.22.[58]

## B. Interest on T&P Benefits

---

[58] There are 326 days between February 8 and December 31, 1995 which equates to approximately 89.3% of the year. To calculate the amount of simple interest for that percentage of a year, the court multiplied 89.3% with $23,100 ($1,775 INCAP monthly benefit times 12 months) x 9.84% (120% of the federal mid-term rate for 1995) which equals $1,871.91 simple interest for 1995. That amount of interest was added to the calculations found at D.I. 207, Ex. C-2 (after confirming the accuracy of those calculations) by substituting the $1,871.91 for $522.54 (DuPont's calculation for interest based on a start date of October 1, 1995). The increase from the calculations propounded by DuPont represents the additional interest between February 8 and October 1, 1995.

19

### 1. Criteria for Awarding T&P Disability

Skretvedt asserts a claim for interest under disgorgement or constructive

trust theories pursuant to § 502(a)(3)(B) for the delayed payment of T&P benefits.

DuPont argues that Skretvedt must establish that the T&P benefits were wrongfully

withheld or delayed by demonstrating arbitrary and capricious conduct. DuPont also

points out that, based on the Plan's eligibility standards, it could not address

Skredvedt's claims for T&P benefits until a final determination was made on his

application for INCAP benefits.

> Two different long-term disability benefits are provided in DuPont's pension Plan:
>
> An employee is eligible for incapability benefits if he is 'permanently incapable of *performing the duties of his position with the degree of efficiency required* by the Company. . . .' Under its separate T&P benefits Plan, . . . additional benefits [are provided] to individuals who are 'disabled . . . and presumably will be *totally and permanently prevented from pursuing any gainful occupation.*'[59]

As evidenced by the standards of the Plan, a participant cannot qualify for T&P benefits

if he does not qualify for INCAP benefits; however, a participant may qualify for INCAP

benefits, and not for T&P benefits.[60] To qualify for T&P benefits, a participant must

show that he is totally and permanently prevent from pursing *any* gainful employment.

Thus, an award of INCAP does not automatically mean a participant is entitled to T&P

benefits.

In *Skredvedt I*, the Third Circuit only found that the denial of INCAP benefits was

---

[59] *Skretvedt I*, 268 F.3d at 171(emphasis added).

[60] *See id.* at 185. Because of the relationship between INCAP (own occupation standard) and T&P (any occupation standard), if INCAP benefits are not awarded, then neither can T&P benefits be granted.

arbitrary and capricious because there was no conflicting evidence,[61] and on that basis

reversed the granting of summary judgment for DuPont on those benefits. The court,

however, vacated the granting of summary judgment in favor of DuPont on T&P

benefits and *remanded* the matter to the this court with the "assumption" that it would

direct DuPont to consider that claim in the *first* instance. The Third Circuit specifically

noted that although "Skredvedt is incapable of performing the duties of his previous

position at DuPont, he may nevertheless be ineligible for T&P benefits."[62] In neither

*Skredvedt I* nor *Skretvedt II* did the Third Circuit find DuPont's denial of T&P benefits as

arbitrary and capricious and, therefore, wrongful. After remand, and the entry of the

December 13, 2001 order, DuPont paid both INCAP and T&P benefits.

In any analysis to determine whether delayed payment of benefits is wrongful,

the court analyzes the facts and evidence to determine whether the failure to pay was

arbitrary and capricious. In the present matter, the court will review the evidence and

facts that were before the Board during the appeal process in 1998.

In addition to the medical information submitted with his initial application for

benefits,[63] Skretvedt submitted on his administrative appeal:  two letters from Dr.

Richard B. Zonderman, a clinical psychologist who in March 1997 performed a clinical

---

[61] *See id.*

[62] *Id.*

[63] With his initial application, Skredvedt submitted several letters, records and reports from various physicians and clinical psychologist. Those records, which covered the time frame of 1994 through October 1995, showed improvement in Skredvedt's condition after his termination from DuPont as an environmental engineer and after medication (antidepressant drugs) was prescribed. His treating health care providers concluded that he could not return to his former position or job assignment "because of the anxiety precipatated [sic] . . . by this type of work." *Skredvedt I*, 268 F.3d at 171-73. None of those reports concluded that Skredevedt was totally and permanently prevented from pursuing *any* gainful employment.

21

interview and two types of standard psychological tests; updated letters from Drs. Graenum Schiff (April 1997 and July 1998) and Harold Binhammer (May 1997); and a letter from the Social Security Administration denying his claim for disability insurance benefits.[64]

Dr. Zonderman's first letter describes the clinical interview and two standardized psychological tests. According to Dr. Zonderman, Skretvedt was suffering from a "prominent anxiety disorder," and as a result "'[r]eturn to a job resembling the environmental engineering position which caused [Skretvedt's] problems would most likely precipitate post traumatic stress like symptoms.'"[65] In his second letter, dated July 29, 1998, Dr. Zonderman opined that Skretvedt's emotional problems had been caused by his job with DuPont, that he was still in therapy in July 1998 with two different doctors, and that "'he cannot return to a similar work environment . . . .'"[66]

The first letter from Dr. Schiff, dated May 9, 1997, concurred with Skredvedt's other treating professionals finding that "'Skretvedt would never be able to return to his position at DuPont.'"[67] Dr. Schiff related that "when Skretvedt attempted to return to a job in his old field of industrial hygiene (i.e., his job as a compliance inspector at the Virginia Department of Labor) 'his symptoms returned and his condition deteriorated.'"[68]

---

[64] *Skredvedt I*, 268 F.3d at 179.

[65] *Id.* at 179-80.

[66] *Id.*

[67] *Id.*

[68] *Id.*

Dr. Schiff's second letter, dated July 28, 1998, updated his previous letter regarding

Skretvedt's condition.[69] Thereafter, on August 17, 1998, Dr. Schiff recommended a

two-month medical leave of absence. He did not conclude that Skretvedt was

permanently unable to return to any gainful employment.[70]

According to Dr. Binhammer in his report dated May 9, 1997:

> [D]uring the time that Skretvedt worked as a furniture refinisher, [the
> post-traumatic] episodes were less frequent because of the change
> of job environment, but that when Skretvedt attempted to return to his
> old field, the symptoms returned and 'escalated.'[71]

Finally, Skretvedt submitted the letter from the Social Security Administration denying

his claim for disability insurance benefits. As discussed previously herein, although the

SSA found that Skretvedt was permanently unable to perform his previous job at

DuPont or similar employment, it concluded that he was ineligible for disability

insurance benefits because he was able to perform other work.[72]

### 2. Skretvedt is Not Entitled to Interest on T&P Benefits

The Third Circuit remanded the issue whether, under *Fotta v. Trustees of*

*the United Mine Workers*,[73] Skretvedt is entitled to interest on his delayed T&P

---

[69] See id.

[70] See id.

[71] Id.

[72] See id.

[73] 319 F.3d 612 (3d Cir. 2003) ("*Fotta II*").

benefits.[74] *Fotta II* recognizes that an ERISA beneficiary is "presumptively entitled,"
pursuant to § 502(a)(3)(B) "to interest on his delayed benefits *only if* those benefits
were wrongfully withheld or wrongfully delayed, that is, only if they were withheld or
delayed in violation of ERISA or an ERISA plan."[75] Skretvedt is not entitled to interest
on his T&P benefits because he fails to demonstrate that DuPont wrongfully withheld or
delayed paying his T&P benefits.

In *Fotta II*, the Third Circuit noted that a plaintiff seeking interest on the delayed
payment of benefits pursuant to § 502(a)(3)(B) "must meet a high standard" and
"eligibility determinations are wrongful only if they are arbitrary and capricious."[76] The
record in the present matter does not support such a finding. When the Third Circuit
instructed this court to enter judgment in favor of Skretvedt on INCAP benefits, DuPont
re-assessed Skretvedt's T&P claims in light of the Third Circuit's findings on INCAP and
voluntarily paid T&P benefits.[77] Skretvedt was not required to proceed with further
judicial proceedings to obtain those benefits.[78] Moreover, as noted by the Third Circuit,
Skretvedt "represented to the Magistrate Judge that DuPont had paid those benefits,"
and never argued "that DuPont in any way failed to award T&P benefits or

---

[74] *See Skretvedt II*, 372 F.3d at 215.

[75] *Fotta II*, 319 F.3d at 617 (emphasis added).

[76] *Id.*

[77] At the time T&P benefits were not awarded, the Board had found that Skretvedt did not qualify
for INCAP benefits. Under those circumstances, as discussed previously herein, the Board could not
award T&P benefits.

[78] *See Skretvedt II*, 373 F.3d at 198.

24

miscalculated the award of T&P benefits."[79]  Thus, Skretvedt did not previously suggest

that DuPont wrongfully withheld or improperly delayed payment of his T&P benefits.

Skredvedt appears to argue that because no additional medical evidence was

provided or required before DuPont paid T&P benefits, that sole fact proves that its

previous failure to pay T&P was arbitrary and capricious.  The medical and

psychological reports and testing submitted, however, only show that "[a]ll of [his]

physicians and psychologists concluded that Skretvedt was unable to return to his

previous job at DuPont."[80]  The Explanation and Determination from the Social Security

Administration came to the same conclusion, "that Skretvedt's 'condition prevents [him]

from doing the type of work that [he] has done in the past.'"[81]  Moreover, the SSA

specifically found that Skredvedt did not qualify for disability benefits because his

condition "'does not prevent [him] from doing less demanding work that does not require

extensive public contact.'"[82]

Between February 1995 and October 1998, Skretvedt held two different jobs.  In

1995, he started a furniture repair and refinishing business, which earned a modest

profit in 1995, but lost money in 1996.  There is no evidence that that employment

ended because of his disability.[83]  In May 1996, Skretvedt began working for the

---

[79] *Id.* at 201.

[80] *Skredvedt I*, 268 F.3d at 172.

[81] *Id.*

[82] *Id.* at 172-73

[83] Skredvedt apparently stopped the repair and refinishing business for financial reasons, which are irrelevant as to whether he qualifies for T&P benefits or whether there has been a violation of ERISA.

Virginia Department of Labor as a compliance inspector.[84] "The position involved a two-year training period, during which his job responsibilities gradually increased. Skretvedt's work-related anxiety and depression increased in 1998 as his training period ended."[85] After Skredvedt completed the training and began the full responsibilities of a compliance officer, his condition worsened. Dr. Schiff recommended a two-month medical leave of absence. Skretvedt eventually resigned from his position at the Virginia Department of Labor.[86]

Unlike the absence of conflicting medical evidence to qualify for INCAP benefits noted in *Skredvedt I*, there is ample evidence that Skredvedt was and is not totally and permanently disabled from employment, and therefore, may not qualify for T&P benefits. Except for a recommended two-month leave of absence by Dr. Schiff from his employment with the Virginia Department of Labor (at a position very similar to his prior work at DuPont) and the fact that Skredvedt subsequently resigned from that position, the medical and psychological evidence primarily focuses on his inability to return to the type of job that he did with DuPont. Further, Skredvedt successfully completed his training period with the Virginia Department of Labor; he was able to start, manage and operate his own business for over a year; and the social security determination concluded that he could do less demanding work than his prior employment with DuPont. Therefore, the failure to award T&P benefits was not arbitrary and capricious.

---

[84] As noted previously herein, the compliance inspector position was very similar to the position Skredvedt held with DuPont.

[85] *Skredvedt I*, 268 F.3d at 173.

[86] *See Id.*

26

As a result, the delayed payment of T&P benefits was not wrongful.

Skredvedt suggests that DuPont awarded T&P benefits in 2002 on the same medical evidence on which it had initially denied disbility benefits in 1996. Skredvedt is wrong as evidenced by the discussion herein of *Skredvedt I*. Additional evidence *was* submitted to the Board in 1998.

Skredvedt suggests that "any job" is defined as paying more than 60% of his current salary and appears to reference Dr. Schiff's comments in support of this argument. As has continuously occurred in his briefing (which motivated the court to order supplemental briefs and caution the parties to provide supporting *evidence* for their arguments), Skredvedt has again made bald assertions and conclusions or references "statements" (usually out of context) without providing any documentary support. The court has no means to determine their accuracy or relevance. Moreover, his argument ignores the different standards for INCAP and T&P benefits as noted by the Third Circuit. Further, there is no evidence that Dr. Schiff's comments are at all relevant to the Plan documents or standards. There is no evidence that 1) Schiff is a member of the Board or is aware of the Plan language and standards; 2) whether "comparable job" is language from the Plan, defined in the Plan or applicable to INCAP or T&P; or 3) whether the ability to earn 60% of the DuPont salary is relevant to the determination of either INCAP or T&P.[87] In short, the court has no idea from where any such "alleged evidence" came.[88]

---

[87] In light of *Skredvedt I*, it appears not to be relevant.

[88] The court's use of the word "evidence" is overly generous and does not imply it accepts it as such.

27

In light of the court's findings that the Board's decision in relation to T&P benefits was not arbitrary and capricious and therefore, not wrongful, the parties' arguments concerning constructive trust, disgorgement or other restitutionary relief under § 502(a)(3)(B) are moot and need not be addressed.

### C. Postjudgment Interest

Skretvedt applies a 10% postjudgment interest rate to the INCAP benefits, based on the rate authorized under 6 *Del. C.* § 2301(a).[89]  In support of the application of § 2301(a) to calculate postjudgment interest, Skretvedt relies upon *Gelof v. Papineau*.[90]  DuPont asserts that it is inappropriate to address postjudgment interest since there has been no money judgment on either INCAP or T&P benefits.  Further, DuPont argues that, if any postjudgment interest is awarded, 28 U.S.C. § 1961 controls.

In its conclusion, the Third Circuit directed this court to reconsider whether Skretvedt is entitled to prejudgment interest on INCAP benefits and/or interest on the delayed payment of T&P benefits, "without prejudice to Skretvedt's ability to file a timely motion for postjudgment interest on any resulting award of prejudgment interest (with

---

[89] Skretvedt's analysis suggests that the Federal Reserve discount rate has remained at 5% since December 13, 2001, but provides no evidence in support.  Under § 2301(a), an additional 5% is added to the Federal Reserve discount rate for a breach of a contract that contains no expressed rate.  Moreover, the court notes that the Federal Reserve discount rate does not and has not remained static as evidenced by the reliable exhibits provided by DuPont.

[90] 829 F.2d 452, 456-57 (3d Cir. 1987).  Contrary to Skretvedt's argument, *Gelof* held that postjudgment interest is governed by 28 U.S.C.§ 1961, and the appellate court reduced the district court's award of a 17% interest to the statutory rate.  Therefore, § 1961 applies to a *federal* judgment, not 6 *Del. C.* § 2301(a) which is a state statute.  Moreover, *Skredvedt II* analyzed postjudgment interest under 28 U.S.C. § 1961, and not under state law.

respect to incapability benefits) or interest (with respect to T&P benefits).["91] Such
language and that court's preceding analysis on postjudgment interest under 28 U.S.C.
§ 1916 indicates that, after a money judgment is entered, this court will then address
postjudgment interest on INCAP benefits upon a timely and appropriate motion filed by
Skretvedt.

The United States Supreme Court has found that postjudgment interest under 28
U.S.C. § 1961 "properly runs from the date of the entry of judgment."[92] Moreover, the
Third Circuit stated in *In re Lower Lake Erie Iron Ore Antitrust Litigation*,[93] that § 1961
"does not, by its terms, mandate that the judgment from which interest is calculated
must be a final judgment. Our view is consistent with the statute's philosophy of
providing compensation from a point at which the loss-causing defendant's liability is
entered on record."[94] While postjudgment interest, however, may accrue on a non-final
judgment under *Iron Ore,* the phrase "any money judgment" in § 1961(a) "requires that
the judgment at issue award a fixed amount of fees to the prevailing party in order to
trigger the postjudgment interest period."[95] As noted by the Third Circuit, the judgment
entered for INCAP benefits on December 13, 2001 did not constitute a monetary

---

[91] *Skretvedt II*, 372 F.3d at 218.

[92] *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835 (1990).

[93] 998 F.2d 1144 (3d Cir. 1993).

[94] *Id.* at 1177-78.

[95] *Eaves v. County of Cape May,* 239 F.3d 527, 534 (3d Cir. 2001).

29

amount.[96] As a result, postjudgment interest under § 1961 could not accrue from that date because no "*money judgment*" had been entered.[97] In light of this analysis under *Skredvedt II*, an award of postjudgment interest on INCAP benefits is not presently allowed. Moreover, consistent with the Third Circuit's findings in *Skredvedt II*, no postjudgment interest for DuPont's alleged four month delay in paying T&P benefits is recoverable under § 1961.[98]

The Third Circuit provided guidance in *Skredvedt II* regarding how to calculate postjudgment interest. With respect to INCAP benefits, postjudgment interest would be calculated on the underlying judgment and the award of prejudgment interest.[99] Should this court in the future be required to address postjudgment interest for INCAP benefits, it will apply the analysis of *Skredvedt II*.[100]

## CONCLUSION

After careful review and consideration of the facts related to this matter,

---

[96] *See Skretvedt II*, 372 F.3d at 217. Before entry of the December 13, 2001 order, neither party provided the court any information regarding the monthly, annual or accrued amounts of INCAP or T&P benefits.

[97] *See Fotta II*, 319 F.3d at 618 (Section 1961 provides that "interest shall be allowed on any money judgment in a civil case recovered in a district court.").

[98] Since there was no judgment for T&P benefits at the time, in *Skredvedt II*, the Third Circuit held that there was "no basis for an award of postjudgment interest under § 1961" on those benefits. *Skredvedt II*, 372 F.3d at 216, n.31. Because of this court's conclusions herein under Part B, there is still no judgment nor any money judgment for T&P benefits. Therefore, no postjudgment interest on T&P benefits may be awarded.

[99] *See id.* at 217 *(quoting Sun Ship, Inc. v. Matson Navigation Co.,* 785 F.2d 59, 63 (3d Cir. 1986); *Caffey v. UNUM Life Ins. Co.,* 302 F.3d 576, 586 (6th Cir. 2002) ("[P]ostjudgment interest should be awarded on the entire amount of the judgment, including any prejudgment interest.") (noting agreement among the Fourth, Ninth, Tenth and Eleventh Circuit Courts)).

[100] Assuming that analysis is not modified and remains good law.

the court finds that Skretvedt is entitled to prejudgment interest from February 8, 1995 until December 13, 2001 in the amount of \$10,570.22. To the extent that Skredvedt moved for application of a constructive trust on INCAP benefits, his motion is denied. Skredvedt's motion for prejudgment interest and/or the application of a constructive trust on T&P benefits is denied. Further, his motion for postjudgment interest on T&P benefits is denied. Pursuant to 28 U.S.C. § 1916, Skretvedt's motion for postjudgment interest on INCAP benefits is denied, with leave to timely refile.